# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RAYMOND E. SIMS-LEWIS | * | |
| Plaintiff | * | |
| v | * | Civil Action No. RDB-16-3967 |
| SGT. JOHNSON, *et al*. | * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM OPINION

In response to this civil rights complaint, Defendants Johnson and Dangerfield, Correctional Officers at the Maryland Reception Diagnostic and Classification Center (MRDCC) filed a Motion to Dismiss or in the alternative for Summary Judgment. ECF 15. In opposition Plaintiff filed a Motion to Proceed with Trial. ECF 18. The Court finds no need for a hearing. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow Defendants' motion, construed as a Motion for Summary Judgment, shall be GRANTED.

### I. BACKGROUND

#### A. Plaintiff's Claims

Plaintiff Raymond E. Sims-Lewis an inmate committed to the custody of the Maryland Department of Public Safety and Correctional Services (DPSCS) and currently confined in the Baltimore Central Booking & Intake Center (BCBIC) (*see* ECF 19), alleges that while he was incarcerated at MRDCC he was assaulted by Sgt. Johnson and Officer Dangerfield. ECF 1 at pp. 3-4. He states that on October 20, 2016, Dangerfield choked Plaintiff "almost to death" but that Plaintiff was able to break free from the "death hold." *Id*. at p. 3. Once free, Plaintiff was handcuffed and "repeatedly punched in the face" by both Dangerfield and Johnson "while chief of security supervised." *Id*. Plaintiff claims that Johnson and Dangerfield called him a "bitch ass

nigger" each time they punched him in the face. *Id*. at p. 4. As a result of the assault, Plaintiff claims he suffered injuries to his mouth and that he received antibiotics "for the open bruises." *Id*. Plaintiff claims that his Eighth Amendment right to be free from cruel and unusual punishment was violated and that Dangerfield and Johnson violated his rights under the Maryland Tort Claim Act and the Local Government Tort Claim Act. *Id*. He states he suffered emotional distress "due to . . . having a mental health crisis as the state personel (sic) training wasn't equipped for handle mental health patients." *Id*. As relief he seeks compensatory damages.

B. **Defendants' Response**

Defendants provide verified business records which include their written statements prepared on the day of the incident concerned in the complaint. Sgt. Dangerfield reported that he responded to the "PSA area" on October 20, 2016, after being informed that Plaintiff was refusing to return to his housing unit. ECF 15 at Ex. 1, p. 9. When Dangerfield asked Plaintiff why he was refusing to return to his housing unit, Plaintiff responded that he wanted to see a doctor "and not that man I want to see the woman." *Id*. Dangerfield informed Plaintiff that the female doctor he was referring to was not there that day. *Id*. Plaintiff became upset and then stated he wanted to be placed in a single cell. *Id*. When Dangerfield told Plaintiff he would not get a single cell and that he had to go back to his housing unit, and ordered Plaintiff to stand up and place his hands behind his back to be handcuffed, Plaintiff became irate. *Id*. Plaintiff stood up and told the officers not to touch him and "jumped towards Sgt. Johnson in an aggressive manner." *Id*. In response to Plaintiff's aggression, Dangerfield and Johnson took him to the floor, placed handcuffs on him, picked him up, and escorted him to the medical unit where he

was seen by a nurse. *Id.* Dangerfield's statement under oath prepared for this case reflects the same account of events. ECF 15 at Ex. 2.

Sgt. Johnson's statement reflects a similar course of events. ECF 15 at Ex. 1, p. 7. Johnson states he was called to "PSA" because Plaintiff was refusing to leave the area "because he wanted to have a single cell." *Id.* After Plaintiff was told "he was not single cell status," Plaintiff became loud and yelled he was "not going anywhere." *Id.* Johnson states that Plaintiff was given a direct order to turn around to be handcuffed, but he "became combative" and "lunged toward [Johnson's] upper torso and was taken to the floor." *Id.* Johnson "secured [Plaintiff's] right arm and handcuffs were applied." *Id.* In a later report written by Johnson, he states that Plaintiff "stood up and charged at me wrapping his arms around my waist." *Id.* at p. 33. Johnson's statement under oath prepared for this case reflects the first statement he wrote regarding this incident, *i.e.*, it does not include an allegation that Plaintiff wrapped his arms around Johnson's waist. ECF 15 at Ex. 3.

Johnson was called by radio to the area by Officer Natalie Porter who reported that Plaintiff was refusing to leave "bullpen #33." ECF 15 at Ex. 1, p. 10. Porter reported in her statement that Johnson gave Plaintiff a direct order to turn around and put his hands behind his back to be cuffed, but Plaintiff "became combative and lunged toward" Johnson. *Id.* Porter states that a "10-13 was called" and Plaintiff "was taken down to the floor . . . secured and escorted to medical." *Id.*

The incident was investigated by Major Vivian Staten, who determined that the "force used was justified in self-defense." ECF 15 at Ex. 1, p. 14. Staten further found that Plaintiff "refused several verbal commands to be handcuffed instead charging after Sergeant Arnold Johnson." *Id.*

3

With regard to Plaintiff's statement that he was having a mental health crisis (*see* ECF 1 at p. 3), Defendants provide copies of Plaintiff's relevant mental health records. ECF 15 at Ex. 4, p. 16. Plaintiff was seen on October 20, 2016, the date of the incident, by Edward Diamond, Psychology Associate. In the progress note written by Diamond, he explained that medical staff requested that someone from the psychology department interview Plaintiff because "he reportedly presented himself at sick call this morning with complaints of anxiety." *Id*. Diamond described Plaintiff as presenting "himself in an angry and agitated fashion." *Id*. Plaintiff "refused to cooperate with attempts to assess his mental status." *Id*. Diamond noted that Plaintiff had been seen by "psychiatry at MRDCC" and was prescribed Risperdal, Prozac, and Diphenhydramine, which he began taking one-month previously.[1] *Id*.

As background, Diamond reported that on October 19, 2016, Plaintiff came to the medical department complaining of chest pain and told Diamond he was given Tylenol, put into the bull pen for observation, and placed on bed rest. *Id*. On October 20, 2016, Plaintiff was called to the medical department in response to a sick call request he had put in previously regarding his eyesight and requesting glasses. *Id*. Plaintiff told Diamond that the nurse evaluated his vision, but that he was not told the disposition of his request regarding his vision. *Id*. His blood pressure was elevated (140/111), but Plaintiff denied any history of treatment for hypertension. *Id*.

During his encounter with Diamond, Plaintiff voiced suicidal thoughts and stated that his plan was "to jump off of the upper tier 'face first' and land on his neck." *Id*. At that time Plaintiff did not know when or where he would carry out this plan and told Diamond that he needed to be housed alone, prescribed Elavil, and that Diamond needed to accompany him to

---

[1] Plaintiff's history includes a diagnosis of schizophrenia and borderline personality disorder. *See* ECF 15 at Ex. 4, p. 21.

court. *Id*. Diamond states in his progress note that Plaintiff would be referred to the "IMHU at BCBIC for placement on suicide/close observation." *Id*. Follow-up with psychology staff was also recommended as necessary or requested. *Id*. at pp. 16 – 17.

The medical record prepared when Plaintiff was brought for evaluation following the use of force indicates that he complained that officers punched him in the face and that he had blood inside of his mouth. ECF 15 at Ex. 4, p. 18. Plaintiff asked for water to drink. *Id*. Rosemary Ojih, RN noted that Plaintiff had "no swelling or discoloration" and that he appeared "very anxious and very cooperative." *Id*. She assessed him with "alteration in emotional status." *Id*.

Shortly after Ojih assessed Plaintiff, he was seen by Roslyn Deshields, NP for the purpose of determining if he was medically cleared for transfer to the mental health unit. ECF 15 at Ex. 4, p. 21. Deshields noted that Plaintiff refused to walk on his own and that he was transported into the medical unit via wheelchair. *Id*. She further noted that Plaintiff was uncooperative, he was not taking medication for any physical illness, and he was medically cleared for the transfer due to active suicide ideation. *Id*. at pp. 21 – 22. Plaintiff was admitted to the mental health unit by Dr. Talmadge Reeves. *Id*. at p. 23.

After arriving in the mental health unit, Plaintiff was seen by Obinneamaka L. Iweh, RN. ECF 15 at Ex. 4, p. 24. Plaintiff related to Iweh that he was "not supposed to be here" because he "was just sitting there waiting for the Doc" and the "officers beat me up for no reason." *Id*. Plaintiff is described as having "flat affect, agitated mood, poor eye contact, audible speech and uncooperative with assessment." *Id*. At that time he denied suicidal or homicidal thoughts, but offered he was "having a really bad anxiety attack" and "had to calm myself down." *Id*. Plaintiff denied experiencing auditory or visual hallucinations,[2] but reported his "history of

---

[2] The following day Plaintiff admitted to Dr. Neil Sandson that he was experiencing auditory hallucinations, but would not reveal the content of the hallucinations. ECF 15 at Ex. 4, p. 36.

5

schizophrenia affective disorder." *Id*. Plaintiff refused to sign a consent to treatment form, refused to have his vital signs taken, and denied pain or discomfort at that time. *Id*.

In the evening of October 20, 2016, Plaintiff reported to Olufemi Otubanjo, PA that he was experiencing body aches including "musculoskeletal neck pain" that he attributed to the use of force incident earlier in the day. ECF 15 at Ex. 4, p. 27. Otubanjo noted that Plaintiff had normal range of motion in his neck and that no visible injuries were observed. *Id*. Plaintiff was provided anti-inflammatory medication for his reported pain and an x-ray was ordered. *Id*. at p. 28. Although the medical records submitted do not include the x-ray results, the numerous encounters Plaintiff had with psychiatric and medical staff indicate that his physical health was not a concern voiced by Plaintiff; rather, he engaged in frequently threatening and menacing behavior toward psychiatric staff in an effort to force them to prescribe medication of his choosing and regularly refused to cooperate with psychiatric assessments by the nurses. *Id*. at pp. 29 – 118 (*see e.g.*, October 22, 2016 record at p. 45 describing attempted assault on Dr. Neil Sandson; and October 25, 2016 record at p. 79 – threats by Plaintiff against Dr. Di Mu).

## II.  STANDARD OF REVIEW

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## III. ANALYSIS

### A. Fourteenth[3] Amendment (Use of force)

The Supreme Court held in *Kingsley v. Hendrickson* that "the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one." __ U.S. __, 135 S. Ct. 2466, 2473 (2015). It is enough that a pretrial detainee show that the "force purposely or knowingly used against him was objectively unreasonable," *id.*, regardless of an officer's state of mind, *id.* at 2472 (cited in *Dilworth v. Adams,* 841 F.3d 246, 255 (4th Cir. 2016)). Pursuant to *Kingsley,* this Court must consider whether under the "facts and circumstances" of this particular case, and from the "perspective of a reasonable officer on the scene," the force used against Plaintiff was objectively excessive. *Kingsley* at 2473.

---

[3] Plaintiff indicates that he was a pre-trial detainee at the time of the incident.

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This Court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 38.

In his Opposition Response Plaintiff does not dispute the circumstances leading up to the use of force against him by Johnson and Dangerfield. ECF 18. Rather, he avers that this case should be tried by a jury, that he passed out and suffered an anxiety attack the day after he was choked by Dangerfield; he has witnesses that should be heard from; the x-ray results were not included with Defendants' motion; he could not exhaust administrative remedies because he was immediately transferred to the mental health unit; and he wants all parties to take a lie-detector test. *Id*. at p. 1. Plaintiff does not provide information regarding who his witnesses might be or how they may testify if called to do so in the course of a merits trial. Plaintiff also does not state what the x-ray results might reveal had they been included and does not provide any information concerning an injury. Rather, Plaintiff appears to take the position that any use of force requires compensation to its recipient by virtue of the Maryland Tort Claims Act[4] and the Local

---

4       Md. Code Ann., State Gov't. §12-101 *et seq*.

Government Tort Claims Act.[5] *Id*. Plaintiff also argues that regardless of the circumstances, punching him in the face and choking him was not a permitted use of force.

Plaintiff has failed to adequately refute Defendants' motion. Plaintiff has not forecast evidence to support his claim that the force used against him was objectively unreasonable. Given the events as described by Defendants, which includes Plaintiff refusing lawful orders and an attempted assault on a correctional officer, the force used against Plaintiff was not unreasonable. The absence of any injury resulting from the encounter is evidence that Defendants' response was tempered and did not include the battering alleged by Plaintiff. The initial examination of Plaintiff revealed no evidence of injuries consistent with Plaintiff's claim he was choked and punched. The near-constant medical supervision Plaintiff was placed under following the use of force also establishes that he was not physically injured and did not exhibit any signs that he was suffering emotional distress as a result of the use of force. Rather, Plaintiff continued to engage in belligerent behavior which he directed at both nurses and psychiatrists which was attributed to his mental health diagnoses. Defendants are entitled to summary judgment in their favor on the use of force claim raised.

### B. Fourteenth Amendment (treatment of psychiatric illness)

The constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "Due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to the convicted prisoner." *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992), (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir.

---

[5] Md. Code Ann., Cts & Jud. Proc. §5-301 *et seq.*

1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id*. The *Bowring* Court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id*. at 48.

Plaintiff's claims against Dangerfield and Johnson with regard to his psychiatric illness appears to be that they were not qualified to handle the situation as it arose on October 20, 2016, because Plaintiff was symptomatic. ECF 18 at p. 2. There is no allegation, however, that Dangerfield and Johnson had any reason to believe that Plaintiff's mental status was anything other than agitated and angry. None of the reports written contemporaneous with the events indicate that Plaintiff appeared to be hallucinating or otherwise incapable of complying with simple, direct orders. To the degree that Plaintiff's mental health issues did cause him to behave in a recalcitrant manner, Defendants were entitled to defend themselves from Plaintiff's attempted assault. Thereafter, Defendants did nothing to hinder Plaintiff's access to psychiatric care, which he received later the same day and continued to receive for days afterward. Defendants are entitled to summary judgment on this claim.

   C.    **Tort Claims**

Plaintiff raises claims under the Maryland Tort Claims Act and the Local Government Tort Claims Act for negligence, defamation of character, negligent hiring, training, and supervision, assault, battery, and intentional infliction of emotional distress. ECF 1 at pp. 3 – 4; ECF 18 at p. 2. In light of the dismissal of Plaintiff's federal claims, this Court declines to

exercise jurisdiction over his state law claims and dismisses them without prejudice. *See Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

## IV. CONCLUSION

Defendants have established that they are entitled to judgment in their favor on all federal constitutional claims raised and their Motion for Summary Judgment shall be granted. Plaintiff's state-law claims shall be dismissed without prejudice and his Motion to Proceed to Jury Trial shall be denied. A separate Order follows.

  December 11, 2017  
Date

　　　/s/  
　　　　　RICHARD D. BENNETT  
　　　　　UNITED STATES DISTRICT JUDGE